Nancy E. Payne, Respondent, v. Sullivan County, Employer Fidelity & Casualty Company, Appellant.—36 S. W. (2d) 127:

Kansas City Court of Appeals. March 2, 1931.

██ 

*U. A. House* and *L. E. Atherton* for respondent.

*George A. Hodgman* for appellant.

ARNOLD, J.—This is an appeal from a judgment of the circuit court affirming an award in the sum of $3462, made by the Workmen's Compensation Commission, as death benefits, to respondent as the widow and dependent of one John O. Payne, deceased, against Sullivan County, Missouri, as the employer, and the Fidelity & Casualty Company of New York, as insurer.

While there are ten assignments of error, as we read appellants' brief, the sole question therein presented for review is whether, considering the provisions of section 13D, of the Missouri Workmen's Compensation Act, under the evidence submitted and findings made by the commission, such award was justified. This section (Missouri Session Acts 1927, page 498,) reads as follows:

"No compensation shall be payable for the death or disability of an employee, if and in so far as the same may be caused, continued or aggravated by an unreasonable refusal to submit to any medical or surgical treatment or operation, the risk of which is, in the opinion of the commission, inconsiderable in view of the seriousness of the injury. If the employee dies as a result of an operation made necessary by the injury, such death shall be deemed to be caused by the injury."

It is conceded of record that plaintiff's husband, while in the course of his employment by Sullivan County in the replacement of an old bridge, accidentally stepped on a nail protruding from a timber; that death ensued caused by tetanus or lock jaw resulting therefrom; that the respondent, claimant, is his widow and filed her claim in due time; that if such death was compensable, the sum awarded was properly within the terms of the Act. Appellants urge that under the evidence the court erred in sustaining the award of the commission for the reason that the death in question resulted from the employee's unreasonable refusal to accept and permit the administering of tetanus anti-toxin or serum. Hence that such ruling was violative of the provisions of the statute, supra. To this issue, then, we shall address ourselves.

In addition to the evidence already noted, the record discloses the injury occurred on July 24, 1928, a few miles from Milan, the county seat of Sullivan County, where Payne resided; that the employee

was taken immediately to Milan and upon arrival, he called upon a Dr. Garner of that city; that am examination disclosed a penetrating wound near the large toe of the left foot; that local treatment was then given; that the doctor advised the use of anti-tetanus serum which, however, was not then administered; that Payne stated he had run nails in his foot before and even without the aid of a doctor no difficulty had been caused; that he was not informed at the time that such administration of anti-toxin would be furnished without cost, and was painless and without any practical danger to his life or limb; that anti-tetanus serum was not in general use in the community; that after tetanus, or lock jaw, as it is commonly called, developed, such serum was used without any benefit and his death occurred August 7, 1928; that if the serum had been given when first mentioned, tetanus would have been unlikely; that generally, such serum is a specific preventative.

Since this controversy primarily centers around the evidence of Dr. Garner, who was a witness on behalf of appellants, we quote part of this testimony:

"Q. Doctor, did you treat John Payne for the injury which he suffered on the 24th day of July, 1928? A. Yes, sir.

"Q. Did you treat him the same day on which the accident occurred? A. Yes, sir.

"Q. Do you remember if he said anything to you about his injury being slight, that he wouldn't have come for any medical attention if the foreman had not told him to? A. Yes, he said that.

"Q. What injury did you find, doctor? A. I found a puncture and a swollen foot.

"Q. What did you do, with reference to giving him anti-tetanus serum? A. Nothing at the time.

"Q. What was said by him and by you, about this anti-tetanus serum? A. I told him that now-a-days they used it to be safe from having lock jaw, and we should use it in this case because with that kind of a wound; and he said that he had run a nail in his foot a good many times before, and he never had a doctor.

. . . . . .

"Q. Now, in this community, isn't it the standard and accepted practice among medical men, in wounds such as Mr. Payne had, and as a part of the standard and customary routine treatments, to inject anti-toxin? A. Well, there had not been very much of that done at that time, here.

"Q. Was it good practice? A. Perhaps the doctors didn't insist upon it enough.

. . . . . .

"Q. Now, doctor, when you saw Mr. Payne that evening and you told him about this treatment, did you insist that he submit to the treatment? A. Well, I simply told him—

"Q. (Interrupting) You simply told him about it? A. Yes, sir. I didn't tell him that he had to have it done or anything like that.

"Q. Doctor, you say that you have been practicing in this community, for how many years? A. Twenty-nine years.

"Q. Now, doctor, in the course of your experience, how many cases of this kind have you treated? A. That is the only one.

"Q. I mean of nails in the foot? A. I don't know.

"Q. Many? A. Yes, sir.

"Q. You have never administered anti-tetanus serum before? A. Not before this case; No, sir.

"Q.' Not before this case. Now, then, doctor, as an experienced doctor in this community, would you say that his refusal to take the serum was an unreasonable refusal.

(Objection interposed; overruled.)

"A. I can't say that it was done unreasonable from his standpoint. He said he had run a nail in his foot a good many times before and he never had had any trouble.

"Q. Do you consider, from his standpoint, that his refusal to take the serum was an unreasonable refusal?

(Objection; overruled.)

"A. No; I don't.

"Q. Doctor, from your own practice and experience as a physician in this community for about thirty years, would you, at that time, consider his position unreasonable? A. Well, that is pretty hard to say, from my standpoint, but it was the thing to do.

"COM. JAMES: From your standpoint, doctor, was it unreasonable? A. No; I don't think it was unreasonable.

"Q. Later on, when tetanus developed, you did administer the anti-toxin? A. Yes, sir.

"Q. Now, you say that you have never seen a case of tetanus before? A. This is the only case I have ever seen.

"Q. You have treated, approximately, how many cases of people running a nail in their foot? A. Well, I haven't any idea; a good many of them.

. . . . . .

"Q. Doctor, you simply explained to Mr. Payne, did you not, that there was such a thing as this anti-toxin treatment and you advised him that it was the safest thing to do? A. Yes, sir.

"Q. Mr. Payne was not an educated man in the sense of being experienced along the lines of injury, and so on, was he? A. No, sir.

"Q. Now, you simply told him about it and you didn't urge him to take it, did you? A. I. didn't urge him as strongly as I should have done.

"Q. Your lack of urging as strongly as you should have done was not the fault of Mr. Payne? A. No, sir. I just explained things to him as I always do and I simply explained the treatment and let it go at that.

"Q. Doctor, you had never heard of anybody else that had taken that kind of treatment? A. I don't recall (of) any.

"Q. What did you do for him, doctor? A. I enlarged the opening some and injected iodine, under pressure, into the opening and, I believe, I applied a poultice that same night under a bandage.

"Q. What did you first do? A. I enlarged the wound.

"Q. With your knife? A. With my knife or scissors.

"Q. Did you ask him, if you could do that—if that was all right—before you did it? A. I don't remember about that.

"Q. Did you ask him if you could inject the iodine before you did it? A. I don't remember.

"Q. Did you ask Mr. Payne if you could apply the poultice before you did it? A. I don't remember.

"Q. Doctor, do you ask your patients what to do with them, before you do it? A. I do, if it was a case of anti-toxin.

"Q. Why? A. Because I haven't done very much of that kind of work in this community.

"Q. Couldn't you have administered the anti-toxin without his knowing it? A. I think we all do that before administering any anti-toxin, we tell him so.

"Q. Why? A. Because they ought to know it.

"Q. Is there any danger about it? A. No, but there is some expense attached to it.

"Q. Where a man's life is in danger do you consider the price of the medicine? Is that the custom of the community? A. No, sir.

"Q. You didn't think it was a serious matter? A. No, sir.

"Q. And then you didn't insist upon him taking it? A. I didn't insist strongly enough."

We note also the testimony of Dr. Montgomery, a resident physician of Milan of more than twenty-five years practice, who was called by appellants. So far as material to the discussion herein, we quote his testimony, as follows:

"Q. Would you think, doctor, that, in this community, the safest, proper and accepted practice for such a treatment would be the injection, promptly, after the injury of tetanus anti-toxin? A. Well, I don't know whether you could say that was thoroughly established or not. As a matter of fact, tetanus is not common in this community. 1 have seen one case in the county prior to this.

"Q. There is a definite danger of tetanus, however, from such injuries, is there not? A. Yes, sir.

"Q. Do you know whether or not that knowledge is generally current in this community? A. I don't believe it is very well established. I don't believe this man knew it. He would have taken it if he had.

. . . . . .

"Q. Doctor, where did you get the anti-toxin that you injected into Mr. Payne? A. Right here in Milan.

"Q. Did he make any objections to your injecting it? A. No, sir; I don't think he made any objections to it.

"Q. After he knew he had tetanus? A. Yes, sir.

. . . . . .

"Q. Doctor, do you know of any case where a man died from taking this serum? A. I believe there is; that is my recollection.

"Q. And then there is the possibility that he died from the anti-toxin itself? A. Possible, very possible.

On October 1, 1929, after a review by the full commission, the award theretofore made by one of its members who conducted the hearing was approved. At the time of the making of the final award, as a part of the record herein of the proceedings, the commission filed its findings of fact and rulings of law. So far as the same is essential to our present consideration, although such findings are not set forth in a form to be followed as a model, it appears the commission found, including the fact that an injury arose out of and in the course of deceased's employment, that such injury resulted in tetanus, causing the death of claimant's husband; that Dr. Garner enlarged the opening of the wound, injected iodine under pressure, and applied a poultice under a bandage, but that no anti-tetanus serum was given at the time; that when asked what was done with reference to giving the employee anti-tetanus serum, the doctor replied: "I told him that now-a-days they used it to be safe from having lock jaw and that he should use it, and he said he had run a nail in his foot a good many times before, and he never had a doctor;" that the doctor also testified he simply told the employee about this serum and did not tell him that he had to have it done or anything like that; that the doctor had practiced medicine for twenty-nine years, and although treating many cases of nail puncture, had never administered anti-tetanus serum before; that there was not a request made to administer anti-tetanus serum, but it was a mere suggestion, one not acted upon by the employee and not insisted upon by the doctor; that a refusal to accept a mere suggestion that employee take an injection of anti-toxin serum for a nail puncture was not such an unreasonable refusal to submit to medical treatment as

132

will deprive employee's dependents of compensation for death from subsequent tetanus.

In the determination of appellants' assignments of error, we must be mindful of the rule that the findings of fact and award of the commission have the force and effect if the verdict of a jury, and in the same way become the basis for a court judgment. [State ex. rel. v. Mo. Workmen's Compensation Commission, 8 S. W. (2d) (Mo.) 899; Woods v. American Coal & Ice Co., 25 S. W. (2d) 144; Cotter v. Valentine Coal Co., 14 S. W. (2d) 660; Jarnagin v. Warner & Co., 18 S. W. (2d) 129.]

Section 44, of our Workmen's Compensation Act (Laws 1927, p. 512) provides, in effect, that the findings of fact by the commission, within its powers, shall be conclusive and binding; and on appeal only questions of law may be reviewed, and the award modified, reversed or remanded for rehearing, or set aside if (1) the commission acted without or in excess of its powers; (2) the award was procured by fraud; (3) the facts found by the commission do not support the award, or (4) there is not sufficient competent evidence in the record to warrant the making of the award.

It is also the rule, as provided by section 51 of the Act (Laws 1927, page 515), that all proceedings before the commission shall be simple, informal and summary, and without regard to technical rules of evidence.

We have carefully read the record herein and the authorities cited by appellants, but are not persuaded that they are applicable or in anywise controlling, and they do not purport to pass on the direct questions here presented. In the light of the testimony of the physicians, to which we have referred, we are not at liberty to declare as a matter of law that there was an unreasonable refusal of medical treatment by the injured employee. On the contrary, the findings of fact made by the commission are supported by substantial evidence, and we believe sufficient to authorize an award in favor if the employee's widow. Accordingly, for the reasons herein set forth, we rule that the judgment of the circuit court approving the award, should be affirmed. It is so ordered. *Bland, J.,* concurs; *Trimble, P. J.,* absent.